**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **SUNGARD PUBLIC SECTOR INC.,**<br>        Plaintiff,<br><br>**v.**<br><br>**INNOPRISE SOFTWARE, INC., N. HARRIS COMPUTER CORPORATION, HARRIS SYSTEMS USA INC., HARWARD INVESTMENTS, INC., CRUSADER INVESTMENTS LLC, DENNIS HARWARD, and JOHN CONNORS,**<br>**Defendants.** | **Case No.: 6:10-CV-01815-19GJK** |

**DEFENDANTS' MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

Defendants N. Harris Computer Corporation and Harris Systems USA (collectively "Harris"), pursuant to Federal Rules of Civil Procedure 8, 9 and 12(b)(2), and 12(b)(6), hereby respectfully request the Court enter an Order dismissing the Second Amended Complaint ("SAC") as to Harris.

**INTRODUCTION**

In 2003, SunGard Public Sector, Inc. ("SunGard") acquired H.T.E. Inc. ("H.T.E.") from its then owner and founder, Defendant Dennis Harward ("Harward"). (SAC ¶ 2). H.T.E. was a software company which designed and maintained software applications for government agencies and utilities. *Id.* Among the assets acquired during this transaction were rights to the NaviLine software product, which was designed and

developed by Harward, as well as certain customer agreements that are at issue in this litigation. (SAC ¶ 20; Ex. A-E, M). For reasons which remain unclear to Harris, as part of this transaction, Harward was either not required to sign an agreement which would limit his ability to compete with SunGard or prevent him from soliciting any of H.T.E.'s former customers and/or signed one which contained terms that were not sufficient to avoid this litigation. SunGard now seeks to correct this oversight through this litigation.

Following this transaction[1], Harward founded and incorporated Defendant Innoprise Software Inc. ("Innoprise"), a software company that also provided software applications for utilities and municipalities in direct competition with SunGard. (SAC ¶ 5). As an adjunct to its core software business, Innoprise provided support services for the NaviLine software product-line. As part of this effort, Harward allegedly solicited those former H.T.E. customers who he knew utilized the NaviLine software product and with whom he had presumably developed a positive working relationship. *See* SAC, Exhibits F-K. Because the customer contracts at issue did not require that the NaviLine product be maintained exclusively by SunGard, and permitted the customers to terminate with 30 days notice, many of these customers decided that it was in the best interest of their business to obtain standard software support services from Innoprise rather than SunGard. Through this litigation, SunGard seeks to correct this second contractual oversight.

SunGard alleges that Innoprise's activities relating to its solicitation and provision of support services for the NaviLine software comprise, *inter alia*, copyright infringement, tortious interference with advantageous business relationships, tortious interference with contractual relationships, violations of Florida's Deceptive and Unfair

---

[1] According to the Florida Department of State Division of Corporations, Innoprise Software, Inc. was incorporated as a foreign for profit company on November 24, 2003. See *www.sunbiz.org*.

Trade Practices Act ("FDUTPA") and unfair competition under the Lanham Act. On October 20, 2009, six years after the consummation of the 2003 acquisition, SunGard sent Innoprise a Cease and Desist Notice which, although not attached to the SAC, presumably addressed these concerns. SAC ¶ 35. Over a year later, in December 2010, SunGard filed its initial complaint against Innoprise but did not join Harris, or any of the other Defendants, until June 27, 2011.

Harris had long sought to acquire Innoprise's assets, including its software assets and customer contracts. Indeed, discussions between Innoprise and Harris date back over six years. During the pendency of this suit, those discussions came to fruition, and on April 29, 2011, Harris acquired Innoprise's assets pursuant to a comprehensive and heavily negotiated Asset Purchase Agreement (the "APA")[2]. *See* SAC ¶ 37. Among the assets purchased by Harris were several customer contracts that Innoprise entered into with former H.T.E customers for the provision of standard software support services relating to the Naviline software. Although the complaint does not or cannot allege that Harris engaged in any improper conduct in the solicitation of any SunGard customer or the improper use of the NaviLine software product in violation of any customer agreement or copyright registration, SunGard nevertheless joined Harris to all counts in this suit, additionally alleging that Harris' purchase of Innoprise's assets was a fraudulent conveyance and that Harris engaged in a civil conspiracy with the remaining defendants to injure and defraud SunGard. *See*, SAC, ¶¶ 45-121. As set forth herein, all of SunGard's claims against Harris are defective and should be dismissed.

---

[2] Given the confidential nature of the APA, SunGard did not attach the APA to the SAC. However, the SAC does incorporate by reference the entire APA (SAC fn. 1). As such, Harris has attached as composite Exhibit "A" certain relevant portions of the APA which it does not deem confidential to this Motion. Given the fact that the contents of the APA were incorporated into the SAC, it is proper for the Court to consider the relevant portions of this agreement when ruling on this Motion. However, Harris has joined in Innoprise's motion to file the entire APA under seal.

## ARGUMENT

**A.  SUNGARD BEARS THE BURDEN TO SHOW ENTITLEMENT TO RELIEF ABOVE A SPECULATIVE LEVEL.**

A plaintiff must plead sufficient facts that show something "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). It must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955 (2007), the Supreme Court held that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). The "factual allegations" in the pleading "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Further, the "plain statement" of a pleading as required by Rule 8(a) Fed. R. Civ. Pro., must "possess enough heft to 'sho[w] that the pleader is entitled to relief'" and to "'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'" *Id.* at 1959 (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)); *see also*, *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ) ("[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal").

In addition to the threshold pleading standard of Rule 8 (a), fraud allegations must also meet the heightened pleading requirements set forth in Rule 9(b). The purpose of these heightened pleading requirements is to alert defendants "to the precise misconduct with which they are charged and [protect] defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Intern. Inc.,* 256 F. 3d. 1194, 1202 (11th Cir. 2001).

SunGard fails to meet their burden to show entitlement to relief under Rule (8)(a), much less the heightened requirements of Rule 9(b). Instead, SunGard plead its Counts in a manner that falls squarely within the Eleventh Circuit's repeated condemnation of "shotgun pleadings." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979-80 and n. 54 (11th Cir. 2008) (explaining that the Eleventh Circuit has, "since 1985[,] ... explicitly condemned shotgun pleadings upward of fifty times"). SunGard's counts assert a laundry list of allegations, each count incorporating a glut of background information relating to conduct allegedly carried out by defendants other than Harris. *See id*. at 980; *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295-96 (11th Cir. 2002); *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001. The Eleventh Circuit has instructed courts to *sua sponte* strike pleading that fall within this category. *Magluta*, 256 F.3d at 1284-85. Accordingly, SunGard's Complaint should be dismissed for this additional reason.

Consistent with this "shotgun pleading," SunGard has failed to allege their individual causes of action sufficiently to state a claim, as discussed in greater detail below, requiring dismissal pursuant to Rule 12(b)(6), as set forth below.

**B. HARRIS IS NOT LIABLE FOR WRONGFUL ACTS, IF ANY, COMMITTED BY INNOPRISE PRIOR TO THE PURCHASE OF INNOPRISE'S ASSETS**

In Counts I-V of its complaint, SunGard fails to identify any wrongful conduct or acts committed by Harris. Instead, in Counts I-V, SunGard simply alleges in conclusory fashion that Harris is liable for Innoprise's alleged wrongful acts as a "successor-in interest" to Innoprise. There is no basis for SunGard's position. Florida law is clear that where one company acquires the assets of another, the purchasing company does not generally assume the liabilities of the prior business. See, e.g., *Corporate Express Office Prods., Inc. v. Phillips*, 847 So. 2d 406, 412 (Fla. 2003) (referring to the general rule against assumption of liability in this context as "the traditional corporate law rule").

There are four limited exceptions to this general rule: (1) when the successor expressly or impliedly assumes the obligations of the predecessor; (2) when the transaction is a de facto merger; (3) when the successor is a mere continuation of the predecessor; or (4) when the transaction is a fraudulent effort to avoid liability of the predecessor. *See, e.g.*, B*ernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049 (Fla. 1982) (holding that a successor corporation did not assume liability for its predecessor's products liability exposure despite having purchased the predecessor's plant, inventory, good will, and trade name, and using the same personnel). None of these limited exceptions apply in this case.

The first exception to the general rule against assumption of liability applies where terms of the agreement between the buyer and seller of assets contemplate, expressly or impliedly, that the successor will assume the predecessor's liability. *See Bernard*, 409 So. 2d at 1049. Where an asset sale contract expressly disclaims successor liability, however, there can be no question that the successor does not assume the predecessor's debts. *See, e.g.*, *Krogen Express Yachts, LLC v. Nobili*, 947 So. 2d 581, 583 (Fla. 4th DCA 2007) (finding no successor liability where "there was only an asset sale, with an express disclaimer of successor liability").

In this case, § 2.7 of the Asset Purchase Agreement expressly holds

> (b) Effective as of the Closing Date, the Purchasers, or either of them, will assume the Assumed Liabilities and no other liabilities of the Seller of any nature.
> (c) The Purchasers shall only be responsible for liabilities, commitments and obligations arising out of or based upon the Purchaser's ownership and operation of the Assets and the Purchased Business from and after the Closing Date.

Further, Section 2.8(f) of the APA further confirms that Harris was not assuming any liability for "any claims directly arising out of the conduct of the Seller [Innoprise] prior to the Time of Closing." *See,* Sections 2.2, 2.7, and 2.8(f) of the APA attached

6

hereto as Exhibit A. Indeed, SunGard has not alleged that in the APA Harris expressly or impliedly agreed that that it would assume liability for SunGard's claims and there is no basis for a finding that Harris expressly or impliedly assumed the Innoprise's liability here. See *Krogen*, 947 So. 2d at 583.

The second and third exceptions apply where either a de facto merger has occurred or where the successor is a mere continuation of the predecessor, neither of which is alleged to have occurred here. A de facto merger occurs where there is a "continuity of the selling corporation evidenced by the same management, personnel, assets and physical location; a continuity of the stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation; and assumption of the liabilities." *Amjad Munim*, M.D., 648 So. 2d at 153-54 (emphasis added) (internal quotations omitted); *Chicago Title Ins. Co. v. Alday Donalson Title Co. of Fla.*, 832 So.2d 810, 814 (Fla. 2d DCA 2002).

The continuity of business exception also requires that the purchaser and seller of assets share the same ownership. See *Amjad Munim*, M.D., 648 So. 2d at 154 (internal quotations omitted). "The key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation." *Id.* (finding successor liability based on the continuation of business theory where the same person was the sole stockholder of both companies).

In this case, the SAC does not and cannot allege that Innoprise and Harris share common officers, directors, stockholders and/or management. Specifically, as alleged in the SAC, Innoprise was owned, at least in part, directed and managed by Defendant Harward, who, although currently employed by Harris, is not and cannot be alleged to have any ownership interest in Harris or any of its affiliates.

Further, the fact that Harris purchased substantially all of Innoprise's assets, is insufficient to turn Harris into a successor in interest. See *Krogen*, 947 So. 2d at 584 (finding no liability even where the successor purchased "most of the assets" of the predecessor and where a press release referred to the successor as an "equity partner" and concluding that "the press release did not create any issue as to the fact that [the owners of the successor] were ... never involved in any way [in the predecessor company]"). See, also *Bernard v. Kee Manufacturing Company, Inc.*, 409 So. 2d 1047 (Fla. 1982) (holding that the purchaser of substantially all of a business' assets who continued manufacturing the same products, maintained the same factory personnel and used the trade name of the selling company did not assume liability for defective products manufactured by its predecessor). See also *Redman v. Cobb Int'l, Inc.*, 23 F. Supp. 2d 1372, 1376 (M.D. Fla. 1998) (finding that the facts "fall far short" of demonstrating continuity where there are "different corporations, with different owners, operating at different times").

The final exception to the general rule against successor liability applies where a debtor makes a fraudulent transaction, that is, whether the transaction was made (a) with the actual intent to hinder, delay, or defraud any creditor of the debtor, or (b) without receiving reasonably equivalent value in exchange for the transfer or obligation. See Fla. Stat. § 726.105. As explained in more detail below with respect to Count VI, SunGard has not adequately alleged that Harris' purchase of Innoprise's assets comprises a fraudulent transaction.

Because the SAC does not and cannot adequately allege that Harris is a successor in interest to Innoprise, Counts I to V, which seek to hold Harris liable for the actions of Innoprise, must be dismissed as to Harris.

### C. SUNGARD'S COUNT FOR VIOLATIONS OF THE UNIFORM FRAUDULENT TRANSFER ACT (COUNT VI) FAILS TO STATE A CAUSE OF ACTION

Under Florida's Uniform Fraudulent Transfer Act, transfers of property may be deemed fraudulent when a debtor makes a transfer either (a) with the actual intent to hinder, delay, or defraud any creditor of the debtor or (b) without receiving reasonably equivalent value in exchange for the transfer or obligation. Fla. Stat. § 726.105. In its complaint, SunGard generally alleges that Harris' purchase of Innoprise's assets was designed to hinder, delay or defraud SunGard, as a statutory creditor, in pursuit of its claims against Innoprise. SunGard, however, fails to adequately plead a violation of Florida's Uniform Fraudulent Transfer Act,

In determining whether a debtor had an actual intent to defraud, Florida courts look to several factors, or "badges of fraud." See *Myers v. Brook*, 708 So. 2d 607, 610 (2d DCA 1998). The "badges of fraud" identified in Fla. Stat. § 726.105 (2) are: (i) whether the transfer was to an insider; (ii) whether the debtor retained possession or control of the property after the transfer; (iii) whether the transfer was disclosed; (iv) whether the debtor had been sued or threatened with suit prior to the transfer; (v) whether the transfer was of substantially all the debtor's assets; (vi) whether the debtor absconded; (vii) whether the debtor concealed assets; (viii) whether the value of the consideration received for the transfer was reasonably equivalent to the value of the assets transferred or amount of the obligation incurred; (ix) whether the debtor was insolvent or became insolvent shortly after the transfer; (x) whether the transfer occurred shortly before or after a substantial debt was incurred; and (xi) whether the debtor transferred the essential assets to a lienor who transferred the assets to an insider. See Fla. Stat. § 726.105(2)(a)-(k).

SunGard either ignores many of the "badges of fraud" identified in the statute or invents contract language which it claims supports its specious allegation that Innoprise

fraudulently conveyed assets to Harris. Specifically, SunGard has not and cannot allege that the following "badges of fraud" are applicable in this case:

- Innoprise's assets were transferred to an "insider[3]" as defined by Florida's Uniform Fraudulent Transfer Act;
- Innoprise retained possession or control of the assets after the transfer;
- The transfer was not disclosed;[4]
- Innoprise absconded following the transfer of its assets to Harris;
- Innoprise concealed the assets;
- Innoprise's transfer to Harris occurred shortly before or after SunGard's claim arose; and
- Innoprise did not transfer the essential assets to a lienor who then transferred the assets to an insider.

It is undisputed that the transfer in this case represented substantially all of Innoprise's assets and that during its due diligence Harris became aware of the fact that Innoprise had been sued by SunGard prior to the transfer. However, these factors alone are insufficient to support an allegation of a fraudulent transfer. Under Florida law, "the mere fact that suit is pending against a person, or that a person is indebted to another, does not in and of itself render fraudulent that person's conveyance of property." *Jacksonville Bulls Football, Ltd.*, 535 So. 2d at 629; *Reina v. Gingerale Corp.*, 472 So.

---

[3] The Uniform Fraudulent Transfer Act defines an "insider" as a relative of the debtor or of a general partner of the debtor; a partnership in which the debtor is a general partner; a partnership in which the debtor is a general partner; a general partner in a partnership; or a corporation of which the debtor is a director, officer, or person in control. *See* Fla. Stat. §726.102(7)(a). None of the Defendants in this case could properly be characterized as "insiders" of Harris.

[4] Indeed, while SunGard alleges that Innoprise did not inform it of the transaction, it acknowledges that it learned of the Harris acquisition in "a press release" days after the transaction closed. SAC ¶ 97. As such, it is clear that there was wide spread disclosure of this transaction

2d 530, 532 (Fla. 3d DCA 1985) (holding that "even if plaintiff could . . . prove that a purchaser had actual knowledge of his pending suit, this factor alone would be insufficient to support a finding of fraud"). See, also *Bay View Estates Co. v. Southerland*, 114 Fla. 635, 154 So. 894 (1934); Stelle v. Dennis, 104 Fla. 384, 140 So. 194 (1932); *Orlando Light Bulb Service, Inc. v. Laser Lighting and Electrical Supply, Inc.*, 523 So.2d 740 (Fla. 5th DCA 1988); *Kirk v. Edinger*, 380 So.2d 1336 (Fla. 5th DCA 1980); *McCrary v. Bobenhausen*, 366 So.2d 77 (Fla. 1st DCA 1978).

To support its tenuous claim, SunGard resorts to blatant mischaracterizations of certain relevant provisions of the APA. Specifically, SunGard places special emphasis on the holdback provisions of the APA, which are customary in such transactions, as an indication of Harris' intent to hinder, delay, or defraud SunGard. See, SAC, ¶ 102-109. SunGard's allegations in this regard are, however, incoherent and inconsistent with the express terms of the APA. The holdback provisions of the APA simply provide that a portion of the purchase price is held back to cover (a) any purchase price adjustment required pursuant to the net tangible asset calculation to be made pursuant to § 2.6 of the APA, and (b) any claims brought against Harris after closing which Innoprise agreed to indemnify Harris against. *See* APA, § 2.11, attached hereto as Exhibit A. This lawsuit is one of several claims for which Innoprise provided indemnity and is subject to the holdback provisions. To the extent SunGard were to obtain judgment against Harris, the holdback funds would ultimately be used by Harris to satisfy SunGard's judgment. On the other hand, to the extent SunGard were to obtain judgment against Innoprise but not Harris, following reimbursement of Harris' attorney's fees and costs, and subject to any other unrelated claims which Harris may have at that time against Innoprise, any remaining holdback funds would ultimately be disbursed to Innoprise and would be available for payment to Innoprise's creditors, including SunGard.

Unfortunately, SunGard elects to bolster its specious claim by misrepresenting the express terms of the holdback provisions of the APA. For example, SunGard inaccurately alleges that the distribution of the holdback monies is "controlled by the outcome of this lawsuit." (SAC ¶ 102) To the contrary, because this lawsuit is one of several potential claims which Innoprise agreed to indemnify Harris against, it hardly controls the distribution of the holdback amounts. Additionally, SunGard falsely claims that the timing for when the holdback amounts are due are tied to the outcome of this litigation when, in fact, the due dates for these payments are fixed in the APA SAC ¶103-105. However, a review of the APA reveals these allegations are diametrically opposite to the APA's express terms.

Specifically, the SAC makes the following misrepresentations:

| SUNGARD'S DESCRIPTION OF THE APA | ACTUAL TERMS OF THE APA |
|---|---|
| "Defendants agreed that the proceeds from the sale are to be disbursed, under the holdback provisions, among parties other than Innoprise, leaving Innoprise without sufficient funds to satisfy a judgment against it." SAC ¶ 103 | "The purchase price in the aggregate amount of …will be payable by the Purchasers to the Seller (or as otherwise directed in writing by the Seller)[5]…"<br><br>The First and Second Holdback Amounts will be "held by the Canadian Purchaser and…released to the Seller." |

---

[5] In fact, prior to closing, the "Seller" (Innoprise) instructed Harris to remit the purchase price to Defendants Crusader Investments LLC and Harward Investments, Inc. who were identified as the primary creditors of Innoprise. The holdback amounts in the APA have not been paid out and, according to the terms of the APA, can only be paid to the "Seller" (Innoprise).

|  | Term **Seller** is defined in the APA as "Innoprise Software, Inc." *See,* APA, Sections 1.1 (definition of Seller); 2.4 (a)-(c) (purchase price and holdback provisions), attached as Exhibit A. |
|---|---|
| "[T]he proceeds from the sale are to be withheld by Harris, pending resolution of this lawsuit, and retained by Harris, in the event that a judgment is entered against it." SAC ¶ 104. | The purchase price…will be payable by the Purchasers to the Seller (or as otherwise directed in writing by the Seller) by wire transfer…**at the Time of Closing."** <br><br> The First and Second Holdback Amounts are to be "released to the Seller" on the **First and Second Holdback Release Dates, which are defined as 12 and 24 months after closing.** *Id. See also*, APA Sections 1.1 (definition of First and Second Holdback Release Dates) (emphasis added) |
| if SunGard "obtains a judgment only against Innoprise, then the proceeds from the sale are to be disbursed, under the holdback provisions, directly to Harward Investments, Inc. and Crusader Investments, leaving Innoprise unable to satisfy the judgment. SAC ¶ 105 | No such terms in the APA.  See above cited provisions of the APA which contradict this allegation. |
| "[t]he consideration paid by Harris for the assets purchased from Innoprise are to be paid directly to Harward, in his individual capacity, | No such terms in the APA. |

13

| | |
|---|---|
| under the employment agreement entered into between Harward and Harris." SAC ¶ 106. | |

Given the fact that the "badges of fraud" required by the statute either do not exist or are contradicted by the express terms of the APA, no claim for fraudulent transfer exists in this case. Thus, Count VI must be dismissed.

**D.  SUNGARD'S COUNT FOR COPYRIGHT INFRINGEMENT (COUNT I) FAILS TO STATE A CAUSE OF ACTION**

In order to state a valid claim for copyright infringement, whether direct, vicarious or contributory, a plaintiff must allege (1) the specific original work that is the subject of the copyright claim, (2) that the plaintiff owns the copyrights in the work, (3) that the work in question has been registered in compliance with the statute, and (4) by what acts during what time the defendant infringed the copyright. *Magic Mile, Inc. v. Benowitz*, 510 F. Supp. 2d 1085, 1087 (S.D. Fla. 2007); *Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1479 (S.D. Fla. 1990). To adequately plead a claim for copyright infringement, plaintiffs must allege by what acts and during what time frame defendants infringed the copyrighted materials. *Magic Mile*, 510 F.Supp.2d at 1087; *Klinger*, 747 F.Supp. at 1479.[6] Here, SunGard failed to satisfy this requirement.

---

[6] *See also, Paragon Servs., Inc. v. Hicks*, 843 F. Supp. 1077, 1081 (E.D. Va. 1994); *Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000) ("A 'properly plead copyright infringement claim must allege…by what acts during what time the defendant infringed the copyright.'"); *Hartman v. Hallmark Cards, Inc.*, 639 F. Supp. 816, 820 (W.D. Mo. 1986) ("In applying Rule 8 to copyright infringement actions, courts have required that particular infringing acts be alleged with some specificity."); *Wildlife Int'l, Inc. v. Clements*, 591 F. Supp. 1542, 1547 (S.D. Ohio 1984) (same); *Gee v. CBS, Inc.*, 471 F. Supp. 600, 644 (E.D. Pa. 1979) ("Plaintiffs must also allege…by what act or acts and on what dates defendants infringed the copyrights."). Similarly, the court in *Hartman v. Hallmark Cards, Inc.* ruled that the complaint in that case did not comply with the Rule 8 requirement of a specific identification of infringing acts where plaintiff merely identified categories of defendants' products, as opposed to
(continued...)

14

As set forth above, SunGard's reliance of a successor-in-interest theory of liability to hold Harris liable for Innoprise's alleged misconduct must fail. Further, SunGard fails to allege by what acts or during what time Harris infringed its copyrights. Indeed, Count I is devoid of any allegations that any infringement occurred after April 29, 2011, the effective date of the APA. Instead, although the SAC is replete with allegations that Innoprise allegedly infringed upon "SunGard P.S.'s exclusive rights with respect to its proprietary NaviLine software and associated source code…." (SAC ¶ 47-51), the SAC merely alleges, in conclusory fashion, that *"[o]n information and belief*, Harris provided maintenance and support services for SunGard P.S.'s NaviLine software in the same manner as Innoprise[7]. SAC ¶ 32 (emphasis added). Such vague and conclusory allegations are insufficient to sustain a claim for copyright infringement.

Furthermore, to the extent that SunGard alleges that the Defendants infringed upon SunGard's copyrights in connection with their maintenance and support services of the NaviLine software product line, it appears that SunGard's own maintenance agreements expressly permit its licensees to modify NaviLine source code. *See e.g.*, SAC, Exhibit A (Agreement for H.T.E., INC. Licensed Programs - City of Cheyenne), § XI ("Customer may modify any licensed program materials"), Exhibit E (H.T.E. Inc. Software License and Services Agreement - City of McKinney), § 2.d  "Customer [is

---

(...continued from previous page)
identifying products by name. *See Hartman*, 639 F. Supp. at 820; *see also Marvullo*, 105 F. Supp. 2d at 226-27, 230 ("The mere allegation that [a magazine] procured a license to use a copyrighted photograph, which [the magazine's parent corporation] later published beyond the scope of that license, is too broad and sweeping to satisfy Rule 8.").

[7] Again, the express terms of the APA contradict SunGard's assumption. In Section 3.1 (gg), Innoprise represents and warrants that "no employee of the Seller has ever accessed or modified the source code relating to the software owned by SunGard Public Sector Inc. or its affiliates (the "SunGard Code") nor is access to the SunGard Code required by the Purchasers, or either of them, under any of the Assumed Contracts following the Closing Date." Section 3.1(gg) of the APA is attached hereto as Exhibit A.

permitted] to Modify any Licensed Programs(s)". SunGard has not, and could not in good faith, allege that Harris ever modified or used any NaviLine source code in any way whatsoever. Even if Innoprise or Harris had modified NaviLine source code (which Harris expressly denies ever having done), they would have done so as an agent of the customer, in full compliance with agreements which expressly permit customer modifications of the NaviLine source code.

Thus, Count I must be dismissed as to Harris.

### E.   SUNGARD'S COUNTS FOR TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS AND TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS (COUNTS II AND III) FAIL TO STATE A CAUSE OF ACTION

In order to state a valid claim for tortious interference with an advantageous business relationship, a claimant must establish five elements: (1) the existence of a business relationship under which the claimant has rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship; (4) by a third party; and (5) damage to the claimant caused by the interference. *Rudnick v. Sears, Roebuck and Co.*, 358 F.Supp.2d 1201, 1204 (S.D.Fla. 2005); *Future Tech Int'l, Ltd. v. Tae II Media, Ltd.*, 944 F.Supp. 1538, 1569 (S.D.Fla. 1996). In order to state a valid claim for tortious interference with a contract, a plaintiff must allege (1) the existence of a contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional procurement of the contract's breach, (4) absence of any justification or privilege, (5) damages resulting from the breach. *McKinney-Green, Inc. v. Davis*, 606 So.2d 393, 397-98 (Fla. 1st DCA 1992); *Farah v. Canada*, 740 So.2d 560, 561 (Fla. 5th 1999); *American Med. Int'l, Inc, v. Scheller*, 462 So.2d 1,8 (Fla. 4th DCA 1984).

Again, while the SAC contains explicit details concerning Innoprise's alleged improper solicitation of SunGard's customers, no such allegations are made against Harris.  As such, SunGard does not and cannot allege that Harris intentionally and unjustifiably interfered with any of SunGard's business and/or contractual relationships.  Indeed, the customer solicitations which were attached to the SAC and comprise the sole factual support for Counts II and III, were all sent out by Innoprise *before* Harris acquired Innoprise's assets.  *See* SAC, Exhibits F-K.

Instead, Counts II and III merely allege that Harris is "liable for Innoprise's tortious interference…as a successor-in-interest."  SAC ¶ 65 and 72.  However, as argued above in detail, Harris cannot be held liable for any alleged acts of interference, or any other wrongful acts, committed by Innoprise.  Thus, Counts II and III must be dismissed as to Harris.

F.   **SUNGARD'S COUNT FOR VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") (COUNT IV) FAILS TO STATE A CAUSE OF ACTION**

Pursuant to Fla. Stat. § 501.204 "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful". Although not specifically identified in the statute, there are essentially three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages.  *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 2007 WL 4124351, 532 F.Supp.2d 1350 (M.D. Fla. 2007).

SunGard does not and cannot allege that Harris engaged in any deceptive acts or unfair practices. Because, as argued above, Harris is not liable for any alleged acts of

17

unfair or deceptive acts or practices, or any other wrongful acts, committed by Innoprise, Count IV must be dismissed as to Harris.

### G. SUNGARD'S COUNT FOR UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER THE LANHAM ACT, SECTION 43(A) (COUNT V) FAILS TO STATE A CAUSE OF ACTION

Pursuant to 15 U.S.C. 1125(a), "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act". To establish a prima facie case under section 43(a), "a plaintiff must show (1) that the plaintiff had enforceable ... rights in the mark or name, and (2) that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.' " *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, Inc., 508 F.3d 641, 647 (11th Cir. 2007) (quoting *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997)).

SunGard does not and cannot allege that Harris engaged in any unauthorized activities where Harris used a word, term, name, symbol, or device in which SunGard alleges enforceable rights in such a manner such that consumers were likely to believe Harris was affiliated with SunGard. Further, as argued above in detail, Harris cannot be held liable for any alleged acts of unfair or deceptive acts or practices, or any other wrongful acts, committed by Innoprise. Thus, Count V must be dismissed as to Harris.

### H. SUNGARD'S COUNT FOR CIVIL CONSPIRACY (COUNT VII) FAILS TO STATE A CAUSE OF ACTION

The elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *Walters v. Blankenship*, 931 So.2d 137, 140 (Fla.App. 5 Dist. 2006) *Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County*, 616 So.2d 562 (Fla. 5th DCA 1993).

As argued above in detail, SunGard has not adequately alleged Harris is liable for any alleged acts of infringement, unfair or deceptive acts or practices, or any other wrongful acts, committed by Innoprise, and has not engaged in a fraudulent conveyance. As such, then, SunGard has not adequately alleged Harris conspired with the remaining defendants to do an unlawful act or to do a lawful act by unlawful means and committed an overt act in pursuance of the conspiracy.

Thus, Count VII must be dismissed as to Harris.

### CONCLUSION

Each of the claims either fails to allege necessary elements of the respective claims or allege facts that are insufficient to support one or more elements of the respective claims. As such, the Complaint should be dismissed in its entirety.

WHEREFORE, Defendants respectfully request the Court enter an Order dismissing the Complaint, and granting any other relief that may be just and necessary under the circumstances.

Dated: July 28, 2011.

Respectfully submitted,

/s/ Dawn Giebler-Millner
Dawn I. Giebler-Millner, Esquire
Fla. Bar No: 0856576
GREENBERG TRAURIG, P.A.
450 S. Orange Avenue, Suite 650
Orlando, FL  32801
Telephone:  407-420-1000
Facsimile:  407-841-1295
gieblerd@gtlaw.com
Counsel for Defendants Harris

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 28, 2011, I electronically filed the foregoing document with the Clerk of the Courts using the ECF system which will send a notice of electronic filing to the following:

| Derek E. León, Esq.<br>dleon@morganlewis.com<br>Benjamin Weinberg, Esq.<br>bweinberg@morganlewis.com<br>MORGAN, LEWIS & BOCKIUS, LLP<br>200 South Biscayne Boulevard<br>Miami, Florida 33131<br>Telephone: (305) 415-3000<br>Facsimile: (305) 415-3001<br>Attorneys for Plaintiff, SunGard Public Sector, Inc. | Dennis D. Leone, Esq.<br>SHANKMAN LEONE, PA<br>dleone@shankmanleone.com<br>609 E. Jackson Street, Suite 100<br>Tampa, Florida 33602<br>Telephone (813) 223-1099<br>Facsimile (813) 223-1055<br>Attorneys for Defendant, Innoprise Software, Inc. |
|---|---|

/s/ Dawn I. Giebler-Millner
Dawn I. Giebler-Millner, Esquire
Florida Bar No: 0856576